IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 9, 2024

**STATE OF TENNESSEE v. LAVERICK CLARK**

**Appeal from the Criminal Court for Shelby County**
**No. C2200616      Carlyn L. Addison, Judge**

**No. W2023-01412-CCA-R3-CD**

A Shelby County jury convicted the Defendant, Laverick Clark, of one count of attempted first degree murder with serious bodily injury, one count of attempted first degree murder, two counts of especially aggravated burglary, one count of aggravated assault, and one count of stalking. The trial court sentenced the Defendant to a total effective sentence of twenty-five years. On appeal, the Defendant contends that the trial court erred when it denied his motion for a mistrial and when it sentenced him. He also contends the evidence was insufficient to support his conviction for attempted first degree murder. Following our review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN, P.J., and JOHN W. CAMPBELL, SR., J., joined.

Joseph McClusky (at trial) and Michael E. Scholl (on appeal), Memphis, Tennessee, for the appellant, Laverick Clark.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Steven J. Mulroy, District Attorney General; Venecia Patterson and Monica Timmerman, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Background and Facts**

This case arises from a domestic violence incident between the Defendant and the victim, who were in a romantic relationship. The victim wanted to end the relationship. The two had an altercation, during which the Defendant attacked the victim and threw a glass bottle at her vehicle, shattering a window. For the next four or five days, the

Defendant called the victim repeatedly, up to fifty times per day, and he sent her threatening messages. Fearful of being alone, the victim asked a friend to stay with her at her home. That night, the Defendant broke into the victim's residence and, while wielding a tire iron, threatened to kill the victim. He then struck the victim in the head with the tire iron at least thirty times. The Defendant swung the tire iron at the victim's friend but did not hit him with it. The victim suffered a head wound requiring twelve stitches, two broken fingers, and a broken palm. While she was hospitalized, the Defendant continued to call and threaten the victim. He also threatened her family. For these offenses, a Shelby County grand jury indicted the Defendant for two counts of attempted first degree murder, two counts of especially aggravated burglary, one count of aggravated assault, and one count of stalking.

The following evidence was presented at the Defendant's trial on these charges: The victim testified that she had known the Defendant for approximately four years and that they began dating in 2019. The relationship lasted until August 30, 2019, when the victim decided to end it. The victim sent a text message to the Defendant telling him to retrieve his belongings from her home. When she returned home from work later that day, she again asked the Defendant to leave with his belongings. The Defendant left, without taking his things, but he returned later that night. The Defendant took the victim's keys and telephone from inside her residence and left. The victim followed him to his parent's house to retrieve her keys and phone. The Defendant's mother called him to bring the victim's items to her. When he arrived, the Defendant tried to jump on the victim while his parents intervened to hold him back. The Defendant "went crazy," slamming the victim into the ground. He shattered the back window of the victim's vehicle with a glass liquor bottle. The victim was able to get her phone back from the Defendant but not her keys, so she left her car, and his mother gave her a ride home.

The next day, August 31, 2019, the Defendant called the victim to apologize and said he would fix her car window. The victim told the Defendant that she no longer wanted to have contact with him. For the next several days, the Defendant continued to contact her and showed up at her house asking to maintain their relationship. On September 1, 2019, the victim returned home from work to find her dog dead. She also noticed some of her clothes were missing. The Defendant continued to call her repeatedly.

At this point in the trial, the Defendant moved for a mistrial based on the victim's mention of her dog, about which she had been specifically told not to testify. Outside the presence of the jury, the trial court heard arguments on the motion and offered to give a curative instruction to the jury, noting that the State did not explicitly attempt to question the victim about the dog's death. When the jury returned, the trial court instructed them not to consider any of the victim's testimony about the dog, stating that it was not part of the indictment and "never happened." The trial court asked the jury if they could uphold

2

their oath and not consider any of the victim's testimony on that issue; the jury members indicated that they could. Later, outside the presence of the jury, the trial court noted that it had found that the State had not elicited the victim's testimony, and that it had considered the strengths and weaknesses of the State's case when considering the Defendant's motion for a mistrial.

The victim testified that on September 9, 2019, she was afraid because the Defendant had been contacting her forty to fifty times per day and making threats against her life. The victim asked a friend, Simon Bowen, to keep her company at her home. That evening, while she and Mr. Bowen were inside her residence watching television, the victim heard a "boom" at the door followed by two more. Soon after, the Defendant ran into her bedroom wearing all black and holding a tire iron. The Defendant began hitting the victim in the head with the tire iron while saying he would kill her. The Defendant hit her on the head approximately thirty times while the victim was screaming and crying. The victim testified that she feared for her life. During the attack, she suffered a head injury that required twelve stitches, and two broken fingers and a broken palm that required a cast on her arm.

The victim identified, and the jury viewed, a picture of the victim's head wound, which was located just above her eyebrow. The victim identified a picture of her entire face which, following the attack, was swollen and bruised, as well as portions of her hair that had been pulled out of her scalp. While at the hospital and in the days after, the Defendant continued to contact the victim and threaten her. He said, "when I catch you I'm gonna kill you." During that time, the victim moved in with her father and got an order of protection against the Defendant, as well as entered counseling and a victim's program.

On cross-examination, the victim clarified that the Defendant kicked the door in to gain access to her residence on the night he attacked her. The victim had gotten the locks changed after the Defendant took her keys the week prior.

Simon Bowen testified that he was with the victim on September 9, 2019, keeping her company because she was afraid of the Defendant. Mr. Bowen and the victim were co-workers and had known each other over ten years. Mr. Bowen heard a loud sound consistent with someone kicking in the door before the Defendant came into the room where Mr. Bowen and the victim were located. The Defendant was wielding a tire iron and started hitting the victim with it and threatening to kill her. Following the attack, the Defendant sent messages to Mr. Bowen threatening him with bodily harm.

Deputy Wynston Robertson testified that he was employed by the Shelby County Sheriff's Office and responded to the victim's residence on September 10, 2019. He met

3

with the victim and asked her to fill out a domestic violence form, which she was not able to do because her injuries were "too severe for her to comprehend and respond to me" and because she appeared to be in pain. He clarified that she could not see because of injuries to her face.

Jasmine Brooks, the victim's sister, testified that, after the victim was released from the hospital, the Defendant began calling Ms. Brooks threatening her with the same actions as he had done to the victim. Ms. Brooks testified that the victim was emotionally distressed following the attack. Ms. Brooks contacted the police about the threats. The General Session court clerk testified that the victim sought an Order of Protection against the Defendant on September 10, 2019, that was granted on October 5, 2019.[1]

Based on this evidence, the jury convicted the Defendant of one count of attempted first degree murder with serious bodily injury, one count of attempted first degree murder, two counts of especially aggravated burglary, one count of aggravated assault, and one count of stalking. The trial court held a sentencing hearing, wherein the State introduced the presentence report. No other evidence was presented. The trial court applied enhancement factor (1), based on the Defendant's criminal history of misdemeanors and felonies. T.C.A. § 40-35-114(1). The trial court applied enhancement factor (6), that the victim's injuries were particularly great, and enhancement factor (9), that the Defendant employed a deadly weapon during the commission of the crime. Finally, the trial court applied enhancement factor (10), that the risk to human life was high, based on the Defendant striking the victim thirty times in the head. *Id.* (6), (9), (10). For the Defendant's attempted first degree murder convictions, the trial court merged counts one and two and imposed a twenty-five-year sentence to be served at 85%; for the especially aggravated burglary convictions, the trial court merged counts three and four and imposed a twenty-five-year sentence to be served concurrently for the attempted first degree murder convictions; for the aggravated assault conviction, the trial court imposed a ten-year sentence; and for the aggravated stalking conviction, the trial court imposed a sentence of eleven months and twenty-nine days, also to be served concurrently, for a total effective twenty-five-year sentence. It is from these judgments that the Defendant now appeals.

## II. Analysis

### A. Motion for Mistrial

On appeal, the Defendant contends that the trial court erred when it denied his motion for a mistrial after the victim testified to bad acts outside the scope of the

---

[1]The State's attorney mistakenly asked the witness if the order of protection was sought in 2021, the year of the trial, rather than 2019.

indictment. He notes that prior to trial the trial court granted his motion in limine to block the victim from testifying about the death of her dog. He contends that the State asked an open-ended question which solicited the victim's inadmissible testimony, and that the trial court's curative instruction to the jury was insufficient to guarantee an impartial verdict. He lastly contends that the State's case was not strong, and that all those factors, taken together, necessitated a mistrial. The State responds that the requisite considerations weigh in favor of denying the motion for mistrial: the victim's testimony was unresponsive to the State's questions; the trial court promptly provided a curative instruction to the jury; and the State's proof of guilt was substantial. We agree with the State that the trial court did not abuse its discretion when it denied the motion for mistrial.

This court will not interfere with a trial court's exercise of its discretion regarding whether to grant a motion for mistrial "absent a clear abuse of discretion on the record." *State v. Hansard*, No. E2021-01380-CCA-R3-CD, 2022 WL 17574357, at *4 (Tenn. Crim. App. Dec. 12, 2022) (quoting *State v. Bell*, 512 S.W.3d 167, 187 (Tenn. 2015)), *perm. app. denied* (Tenn. Apr. 17, 2023). A mistrial is appropriate only when there is a manifest necessity, meaning "a trial cannot continue, or a miscarriage of justice would result if it did." *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000); *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004). The party requesting a mistrial carries the burden of establishing its necessity. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008).

There is not an "'exacting standard' for determining when a mistrial is necessary after a witness has injected improper testimony." *State v. Horn*, No. E2015-00715-CCA-R3-CD, 2016 WL 561181, at *7 (Tenn. Crim. App. Feb. 12, 2016), *no perm. app. filed*. However, in *State v. Welcome*, 280 S.W.3d 215 (Tenn. Crim. App. 2007), this Court identified three factors that should be considered in determining whether the trial court abused its discretion in denying a mistrial: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." *Id.* at 222 (citation omitted); *see also State v. Nash*, 294 S.W.3d 541, 547 (Tenn. 2009) (considering same factors in the context of inappropriate testimony).

The State asked the victim on direct examination about the Defendant's threatening calls and what he was saying to her in those calls. The victim replied, "He kept telling me, I didn't kill your dog. And I said, yes, you did. We was going back and forth about my dog. He kept calling." At this point, the trial court stopped the testimony and excused the jury. In a jury-out hearing, the Defendant moved for a mistrial. The State responded, "I specifically spoke to [the victim] and explained to her that we cannot talk about the dog. . . . . I was not unclear." The trial court stated that the State had not elicited the victim's testimony, finding her inadmissible answer to be "nonresponsive" to the question posed to her. The trial court gave a curative instruction to the jury.

5

Reviewing the *Welcome* factors in turn, the first factor examines whether the State elicited the testimony. *Welcome*, 280 S.W.3d at 222. The State is not deemed to have elicited improper testimony when a witness's answer is either volunteered, unsolicited, or unresponsive to the question asked. *E.g., State v. Dotson*, No. E2019-01614-CCA-R3-CD, 2021 WL 3161218, at *25 (Tenn. Crim. App. July 27, 2021), *perm. app. denied* (Tenn. Dec. 9, 2021). In our view, the State did not deliberately elicit the improper testimony from the victim to show the jury that the Defendant had killed her dog. The victim's testimony came in the context of what she and the Defendant were talking about, and, as the prosecutor had given her specific instructions not to testify about the same, the State could not have known she would speak out of turn. We conclude that the State did not elicit this testimony from the victim and that the first *Welcome* factor does not weigh in favor of a mistrial.

The second *Welcome* factor looks to "whether the trial court gave a curative instruction." *Welcome*, 280 S.W.3d at 222. The trial court gave a proper curative instruction to the jury, telling the jury to "put out of your mind anything you heard about the dog. That's not before [you]. It's not part of the indictment." The trial court questioned the jurors as to whether they could maintain their oath, and they responded affirmatively. This was a proper curative measure. First, the trial court identified the precise testimony for the jury so that the jury could be aware of the specific proof it was being asked to disregard. Second, the curative instruction was given when the issue arose. The law presumes that the jury will follow the trial court's instructions, unless there is "clear and convincing evidence that the jury failed to follow the trial court's instructions." *State v. Harbison*, 539 S.W.3d 149, 163 (Tenn. 2018). We conclude that the trial court gave a proper curative instruction to the jury and that this instruction supports the decision of the trial court to deny a mistrial under the second *Welcome* factor.

Finally, the third *Welcome* factor examines "the relative strength or weakness of the State's proof." *Welcome*, 280 S.W.3d at 222. The weight of the evidence here is significant. Both the victim and an eyewitness testified that the Defendant hit the victim in the head with a tire iron. The State's proof included pictures of the victim's injuries. Given this proof, the testimony about the Defendant killing the victim's dog added very little to the weight of an otherwise strong case for the State. As such, we conclude that the third *Welcome* factor also weighs in favor of denying a mistrial. We cannot conclude that there was "no feasible alternative to halting the proceedings." *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). As such, the trial court did not abuse its discretion in denying Defendant's motion for a mistrial. The Defendant is not entitled to relief.

**B. Sufficiency of the Evidence**

6

The Defendant next contends that there is insufficient evidence to sustain his convictions of attempted first degree murder. He argues that the evidence that the victim survived the attack supports a finding of "intent to do harm, but not the intent to kill." The State responds that the evidence is sufficient to sustain the Defendant's conviction. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given

7

> to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1) (2018). A premeditated killing is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2018). A conviction for attempted first degree murder requires proof that the defendant intended to kill the victim "after the exercise of reflection and judgment" and either intentionally engaged in the conduct constituting the offense, believed the conduct would cause the intended result without further conduct, or the conduct constitutes a substantial step toward the commission of the offense. T.C.A. § 39-13-202(d); *See* T.C.A. § 39-12-202(a)(1) and § 39-12-101 (2018).

The element of premeditation is a question of fact for the jury. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). In *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> Declarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

Here, the Defendant challenges the element of premeditation. The evidence, viewed in the light most favorable to the State, was that the Defendant attacked the victim with a metal tire iron, hitting her in the head approximately thirty times and causing a gaping wound close to her eye. The Defendant also told the victim before and after the

attack that he would kill her. His declarations of his intent to the kill the victim and his use of a deadly weapon against her while she was unarmed are evidence that the Defendant attacked the victim with a premeditated intent to kill. As such, the jury could reasonably conclude that the Defendant was guilty of attempted first degree murder. The Defendant is not entitled to relief.

## C. Sentencing

The Defendant contends that the trial court erred when it sentenced him. He contends that the trial court incorrectly enhanced his sentence and sentenced him outside the appropriate range for his especially aggravated burglary conviction. The State responds that the trial court did not abuse its discretion when it sentenced the Defendant. We agree with the State.

"Sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case." *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.* at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

The misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from a trial court's sentencing decision. *Id.* A reviewing court should not invalidate a sentence on this basis unless the trial court wholly departed from the principles of the Sentencing Act. *Id.* So long as there are other reasons consistent with the purpose and principles of sentencing, a sentence within the appropriate range should be upheld. *Id.*

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by

the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210 (2019); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2019).

We conclude that the trial court properly sentenced the Defendant. The trial court carefully considered the relevant principles and sentenced the Defendant to within range sentences for of his crimes. The trial court applied enhancement factor (1), that the Defendant had an extensive record of criminal activity, based on his numerous prior felony and misdemeanor convictions, and factor (9), based on his wielding a metal tire iron during the commission of the crime. T.C.A. § 40-35-114(1), (9) (2019). The Defendant does not challenge these enhancement factors on appeal. The State concedes that the trial court misapplied enhancement factor (6), that the victim's injuries were particularly great, because serious bodily injury was an essential element of two of the offenses. § 40-35-114(6). The trial court applied enhancement factor (10), that the Defendant had no hesitation about committing this crime where the risk to human life was high, based on the risk to Mr. Bowen's life while he was in the room with the victim during the attack. § 40-35-114(10). The evidence at trial was that the Defendant swung the tire iron at Mr. Bowen. As we have stated, the misapplication of an enhancement factor does not invalidate a defendant's sentence when other enhancement factors have been properly applied, as is the case here. The trial court properly applied enhancement factor (1), based on the Defendant's history of criminal activity, including three felony convictions and eight misdemeanor convictions, and factor (9), based on the tire iron. Finally, the trial court properly applied factor (10), as the risk to human life was high to Mr. Bowen as well as the victim. *Id.* All the factors were supported by the evidence presented at the sentencing hearing and contained in the presentence report. As such, the appropriate application of enhancement factors supports the trial court's sentencing decision. The Defendant is not entitled to relief as to this issue.

As for the Defendant's aggravated burglary conviction, the parties indicate that, at the sentencing hearing, the trial court stated that it was sentencing the Defendant to an out-of-range sentence of twenty-five years. However, the judgment of conviction for especially aggravated burglary (Count 3) reflects the correct sentence for the Class B felony of twenty years. This within-range sentence is supported by the evidence. It should be noted that Count 4, the second especially aggravated burglary conviction, does not specify

a sentence and, therefore, we remand to the trial court for correction of the judgment for Count 4 to reflect a sentence of twenty years, consistent with Count 3.

### III. Conclusion

In accordance with the foregoing, we affirm the judgments of the trial court.   We remand the case to the trial court for entry of a corrected judgment form in Count 4.

_____
ROBERT W. WEDEMEYER, JUDGE

11